## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

DANIEL STEVEN SUMMERS,

        Petitioner,

v.                              Case No.: 3:22-cv-405-MMH-PDB
                                           3:20-cr-48-MMH-PDB

UNITED STATES OF AMERICA,

        Respondent.

_____

## <u>ORDER</u>

Daniel Steven Summers, through counsel, moves to vacate his conviction and sentence under 28 U.S.C. § 2255. (Civ. Doc. 3, Amended § 2255 Motion.)[1] In 2021, Summers pleaded guilty to one count of mail fraud, for which the Court sentenced him to a term of 21 months in prison and 36 months of supervised release. Summers challenges his sentence, arguing that his counsel was ineffective for failing to challenge the loss amount and the applicability of the guidelines commentary. The government responded to the Amended § 2255 Motion (Civ. Doc. 6, Response) and Summers replied (Civ. Doc. 7, Reply). In addition, Summers submitted a notice of supplemental authority concerning <u>United States v. Dupree</u>, 57 F.4th 1269 (11th Cir. 2023) (en banc). (Civ. Doc. 8,

---

[1]     "Civ. Doc. #" refers to docket entries in the § 2255 case, No. 3:22-cv-405-MMH-PDB. "Crim. Doc. #" refers to docket entries in the criminal case, No. 3:20-cr-48-MMH-PDB. Citations to the Amended § 2255 Motion refer to the page number designated by CM/ECF.

Notice of Supp. Authority.) The case is ripe for a decision.

Under 28 U.S.C. § 2255 and Rule 8(a) of the Rules Governing Section 2255 Proceedings[2], the Court has considered the need for an evidentiary hearing and determines that a hearing is unnecessary to resolve the motion. No evidentiary hearing is required because Summers's allegations are affirmatively contradicted by the record or, even if the facts he alleges are true, he still would not be entitled to relief. Rosin v. United States, 786 F.3d 873, 877 (11th Cir. 2015); see also Patel v. United States, 252 F. App'x 970, 975 (11th Cir. 2007).[3]

## I.    Background

In March 2020, a federal grand jury in the Middle District of Florida charged Summers with one count of mail fraud, in violation of 18 U.S.C. § 1341. (Crim. Doc. 1, Indictment.) A little over a year later, assisted by counsel from the Federal Defender's Office, he pleaded guilty to the charge without a plea agreement. (Crim. Doc. 40, Notice of Maximum Penalty, Elements of Offense, Personalization of Elements, and Factual Basis ["Plea Notice"]; Crim. Doc. 84, Plea Transcript.)

---

[2]    Rule 8(a) of the Rules Governing Section 2255 Proceedings expressly requires the Court to review the record, including any transcripts and submitted materials, to determine whether an evidentiary hearing is warranted before resolving a § 2255 motion.

[3]    The Court does not rely on unpublished opinions as binding precedent, but they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Summers admitted that between 2017 and 2018, while operating two businesses—Realty eVest, LLC, and eVest Technology, LLC—he defrauded people who thought they were investing in crowdfunded commercial real estate projects. Plea Tr. at 17–22 (Factual Basis). Summers promoted the scheme through online advertising, marketing companies, and investment seminars aimed at elderly people. He told the victims that if a project reached its funding goal, their money would be forwarded to the developer to further the project (minus a success fee), and if the project was not fully funded, the money would be returned to the investor. Id. The victims were directed to wire money to an escrow account held by Realty eVest, LLC, where Summers promised to hold the funds while a project was pending. In reality, Summers used the victims' money to fund his own companies' operations, including payroll, and when a real estate project failed to reach its funding goal by the crowdfunding deadline, he failed to return the money as promised. Summers furthered the illusion that victims were participating in successful crowdfunded investments by mailing checks or sending wire transfers that purported to be investment returns. Those payments were not funded by legitimate returns on investments, but by the principal investments of other victims. It was a Ponzi scheme, in other words. Although Summers returned some of the victims' investments, he did so only "after they learned that the projects in which they invested had failed to fund and complained to Summers." Id. at 19–20.

The government asserted that Summers obtained $774,910 through the scheme, id. at 22, but Summers disagreed with that amount, id. at 23. Summers also argued that the funds he collected for eVest Technology were "stock payments" that he "had the authority to utilize," though he acknowledged he used those funds to repay investors in Realty eVest. Id. at 22. Nevertheless, Summers admitted that (1) he knowingly devised a scheme to defraud the investors by using false pretenses, representations, or promises, (2) the false pretenses, representations, or promises were about a material fact, (3) he acted with intent to defraud, and (4) in doing so, he used the United States mail. Id. at 23–24. The Magistrate Judge who presided over the plea colloquy reported that "[a]fter cautioning him and examining him under oath concerning each Rule 11 matter, I found that his plea was intelligently, knowingly, and voluntarily made, and that the facts that he admitted establish the elements of the charged offenses." (Crim. Doc. 41.) The Court accepted Summers's plea without objection and adjudicated him guilty.

According to a United States Probation Officer, Summers's advisory guidelines range called for a term of 33 to 41 months' imprisonment, based on a total offense level of 20 and a Criminal History Category of I. (Crim. Doc. 56, Presentence Investigation Report [PSR] ¶ 60.) The offense level included a 14-level enhancement under U.S.S.G. § 2B1.1(b)(1)(H) because the loss amount was greater than $550,000 but less than $1.5 million, specifically, $739,910.

PSR ¶ 21. The loss amount was calculated based on the sum of what sixteen victims had invested in Realty eVest and eVest Technologies. See id. ¶¶ 13, 15 n.1.

Summers, through counsel, objected to the Probation Officer about the calculation of the loss amount. PSR at ECF p. 15, Addendum. Summers argued that the loss amount should not have included $200,000 that two victims—C. Morris and N. Morris—invested in eVest Technology, a separate venture from Realty eVest, which focused on developing the crowdfunding platform itself (rather than specific real estate projects). Summers argued that the $200,000 the Morrises put into eVest Technology was an equity investment, which carried no restrictions on how Summers could use the money. Id. The Probation Officer responded that according to the investment agreement between Summers and the Morrises, eVest could dispose of company assets but only "so long as such disposition is not in violation of … any other agreement or law to which the Company may be bound." Id. The Morrises invested $200,000 in eVest Technologies because Summers led them to believe it would be used for research and development, not so Summers could fund his Ponzi scheme with Realty eVest. See id. at ECF pp. 15–16. Thus, the Probation Officer maintained that the loss amount correctly included the Morrises' $200,000 investment.

At the sentencing hearing, Summers's attorney withdrew the objection to the loss amount and did not object to the guidelines calculation. (Crim. Doc. 77,

Sentencing Transcript at 3.) Without objection, the Court adopted the guidelines range as calculated in the PSR. Id. at 3–4. The government recommended a prison sentence at the low end of the guidelines range (33 months), id. at 13–14, and Summers requested a sentence of probation, id. at 24. The Court observed that the crime was a serious offense that materially harmed real people, some of whom could not afford to lose the thousands of dollars they had invested in the Ponzi scheme. Sentencing Tr. at 25–26. The Court also discussed the need to generally deter white-collar crime. Id. at 30–31. But in mitigation, the Court observed that Summers was over 60 years old with no criminal record, he did not set out to defraud investors when he founded the companies, he did not use the fraudulent scheme to enrich himself, and he quickly took responsibility for the crime. Id. at 27–29. And the Court particularly noted that Summers had repaid over $250,000 to some victims, which the Court said supported a downward variance. Id. at 29, 33–35. Thus, the Court varied 12 months below the guidelines range, sentencing Summers to a term of 21 months in prison followed by three years of supervised release. Id. at 35–36; (Crim. Doc. 61, Judgment).

Summers appealed the sentence. (Crim. Doc. 66, Notice of Appeal.) He also moved for release pending appeal, arguing that the loss amount was incorrectly calculated and he was likely to prevail on appeal. (Crim. Docs. 96, 97, Motions for Release Pending Appeal.) The Court denied the motions, finding

that Summers had not shown that his appeal raised a substantial question of law or fact likely to result in reversal or a new trial. (Crim. Doc. 99, Order Denying Motions for Release Pending Appeal); see also 18 U.S.C. § 3143(b)(1). Summers later moved to voluntarily dismiss the appeal, which the Eleventh Circuit granted on April 27, 2022. (Crim. Doc. 102, USCA Order.) Meanwhile, Summers filed the Amended § 2255 Motion now before the Court.

## II.   Governing Law

Under Title 28, United States Code, § 2255, a person in federal custody may move to vacate, set aside, or correct his sentence. Section 2255 permits collateral relief on four grounds: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court lacked jurisdiction to impose the sentence; (3) the imposed sentence exceeded the maximum authorized by law; or (4) the imposed sentence is otherwise subject to collateral attack. 28 U.S.C § 2255(a). Only jurisdictional claims, constitutional claims, and claims of error that are so fundamentally defective as to cause a complete miscarriage of justice will warrant relief through collateral attack. United States v. Addonizio, 442 U.S. 178, 184–86 (1979); Spencer v. United States, 773 F.3d 1132, 1138 (11th Cir. 2014) (en banc) ("[A] district court lacks the authority to review the alleged error unless the claimed error constitute[s] a fundamental defect which inherently results in a complete miscarriage of justice." (internal quotation marks omitted)). The Supreme Court recognizes that a petitioner's

claim that he was denied the effective assistance of counsel, in violation of the Sixth Amendment, is properly brought in a collateral proceeding under § 2255. Massaro v. United States, 538 U.S. 500, 504 (2003).

To establish ineffective assistance of counsel, a § 2255 petitioner must demonstrate both: (1) that his counsel's conduct amounted to constitutionally deficient performance, and (2) that counsel's deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); Martin v. United States, 949 F.3d 662, 667 (11th Cir. 2020). In determining whether the petitioner has satisfied the first requirement, that counsel performed deficiently, the Court adheres to the standard of reasonably effective assistance. Weeks v. Jones, 26 F.3d 1030, 1036 (11th Cir. 1994) (citing Strickland, 466 U.S. at 688). The petitioner must show, given all the circumstances, that counsel's performance fell outside the "wide range of professionally competent assistance." Scott v. United States, 890 F.3d 1239, 1258 (11th Cir. 2018) (internal quotation marks and citation omitted). In other words, "[t]he standard for effective assistance of counsel is reasonableness, not perfection." Brewster v. Hetzel, 913 F.3d 1042, 1056 (11th Cir. 2019) (citing Strickland, 466 U.S. at 687). To satisfy the second requirement, that counsel's deficient performance prejudiced the defense, the petitioner must show a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Martin, 949 F.3d at 667 (citing Padilla v. Kentucky, 559 U.S. 356, 366 (2010)).

In determining whether a petitioner has met the two prongs of deficient performance and prejudice, the Court considers the totality of the evidence. Strickland, 466 U.S. at 695. But because both prongs are necessary, "there is no reason for a court… to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

A § 2255 movant "bears the burden to prove the claims in his § 2255 motion." Rivers v. United States, 777 F.3d 1306, 1316 (11th Cir. 2015); see also Beeman v. United States, 871 F.3d 1215, 1221–22 (11th Cir. 2017). Moreover, a § 2255 movant is not entitled to a hearing, much less relief, "when his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (citation omitted).

### III.  Discussion

Summers alleges he was denied his right to the effective assistance of counsel at sentencing. Am. § 2255 Motion at 13–23. He argues that his attorney was ineffective because he (1) failed to object to the guidelines calculation since "the loss amount did not properly credit payments against loss," and (2) did not object to the Court's reliance on guidelines commentary that "improperly

9

expanded the scope of the loss amount." Id. at 13.[4]

## A. Credits Against Loss

### 1. Argument

Summers argues that he repaid about $250,000 in misappropriated funds to certain investors, and that those payments should have been credited against the loss amount for guidelines purposes. Am. § 2255 Motion at 14–17. Had the Court done so, he argues, the loss amount would have been closer to the restitution amount (about $486,000), resulting in a 12-level loss amount enhancement instead of a 14-level enhancement and a guidelines range of 27 to 33 months' imprisonment. See id. Because the Court varied 12 months below the bottom of the guidelines range (and 20 months below the top of the guidelines range), he contends that had the loss amount been properly calculated (as he sees it), there is a reasonable probability the Court would have sentenced him to 13 to 15 months in prison instead of 21 months. Id. at 17. The government responds that the $250,000 in repayments did not entitle Summers to a credit against the loss amount because he repaid the funds only after certain victims learned of the fraud, complained about it, and threatened to report it. Response at 8–12.

---

[4]     These arguments differ from the objection that Summers's sentencing counsel raised, and later withdrew, regarding the loss amount. See PSR at ECF pp. 15–16 (Addendum).

### 2. Analysis

The applicable sentencing guideline, U.S.S.G. § 2B1.1, provides escalating enhancements to a defendant's offense level depending on the loss amount, starting with a two-level enhancement for losses greater than $6,500 (but less than or equal to $15,000) and ending with a 30-level enhancement for losses greater than $550 million. Summers received a 14-level enhancement because the loss amount of $739,910 was greater than $550,000 but less than or equal to $1.5 million. PSR ¶ 21; § 2B1.1(b)(1)(H).

Under the guideline's commentary, the loss amount will be reduced "[b]y the money returned … by the defendant … to the victim before the offense was detected." U.S.S.G. § 2B1.1, cmt. 3(E)(i). The commentary explains:

> The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

<u>Id.</u>

While Summers repaid about $250,000 to certain victims, he could not use those repayments to offset the $739,910 loss amount. That is because Summers made none of the repayments "before the offense was detected," measured from "the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or

11

government agency." U.S.S.G. § 2B1.1, cmt. 3(E)(i). Summers does not even allege in the Amended § 2255 Motion that he made any of the repayments <u>before</u> the offense was detected. Am. § 2255 Motion at 14–17.[5] Indeed, as part of the plea colloquy, Summers admitted that he returned property to certain victims only after they learned that the real estate projects they had invested in were not fully funded and confronted Summers about it. <u>See</u> Plea Tr. at 19–20; PSR ¶ 10. In 2019, for instance, Summers repaid some victims in increments of $10,000 to $20,000, but such payments were "in response to victims complaining" or "subsequent to … him becoming aware of this case." Sentencing Tr. at 33. As the prosecutor explained at sentencing,

> [Summers] … went to the effort of paying back certain of his investors who had realized that something was wrong, who had been in touch with the actual developer who was supposed to be building a building, and who had contacted him talking about Realty E Vest being a fraud, and that they would go to law enforcement and reveal what was happening.
>
> And he paid those investors their principal back; again, in an effort to avoid the scheme from being uncovered. And he used other investors' money to do that, including money which people had … invest[ed] into the E Vest [T]echnology side of the business, as well as the Realty E Vest projects.

---

[5] To the extent Summers made false dividend payments to the victims, which Summers admitted were funded by other victims' principal investments and were made to further the illusion that the victims had invested in successful crowdfunding projects, Plea Tr. at 19–21, such payments may not be credited against the loss regardless of when they were made. <u>United States v. Foster</u>, 878 F.3d 1297, 1306 (11th Cir. 2018) ("[A] defendant is not entitled to receive credit for returning money if his sole purpose in doing so is 'to conceal or perpetuate his scheme.'" (quoting <u>United States v. Campbell</u>, 765 F.3d 1291, 1302 (11th Cir. 2014))).

Id. at 7. Summers was present for these comments and did not object.

While Summers's return of about $250,000 to certain victims reduced his restitution obligation to around $486,000, it did not affect the guidelines loss amount, which remained $739,910. Because Summers returned property to the victims only after the victims or a government agency learned of the fraud, he could not use those payments to offset the loss amount under Application Note 3(E) to § 2B1.1. And because Summers was not entitled to a credit against the loss amount, his counsel could not have been ineffective for not raising such an objection. See Freeman v. Att'y Gen., 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim.").

In his Reply, Summers argues that "[t]he Government provides no support for th[e] assertion" that the repayments were made only after the time of detection, Reply at 1, and that "[t]he Government also has not established what they believe to be the date of detection," id. at 2. This argument is flawed in two ways. First, Summers tries to shift the burden of proof onto the government, but a § 2255 movant "bears the burden to prove the claims in his § 2255 motion." Rivers, 777 F.3d at 1316. Thus, it is Summers's burden to prove that the repayments were made before the crime was detected, not the government's burden to prove that they were made after detection. Second, Summers admitted (or did not contest) that he made the repayments only after certain victims complained about the fraud or after Summers learned of the

investigation. <u>See</u> Plea Tr. at 19–20; PSR ¶ 10; Sentencing Tr. at 7, 33. His arguments therefore lack merit.

Summers also was not prejudiced. Even had his attorney successfully objected to the loss amount, Summers fails to show a reasonable probability his sentence would have been any lower. <u>See</u> <u>Strickland</u>, 466 U.S. at 694. Summers assumes that, because the Court varied 12 months below the guidelines range of 33 to 41 months' imprisonment, the Court would have varied equally below a guidelines range of 27 to 33 months' imprisonment under a reduced loss amount. <u>See</u> Am. § 2255 Motion at 17. But the Court's sentencing remarks belie that assumption.

The Court varied below the guidelines range as much as it did, in part, to recognize that Summers had returned about $250,000 to some of the victims, which was not captured in the guidelines calculation. At sentencing, the Court asked the government to explain the difference between the guidelines loss amount ($739,910) and the restitution amount (around $486,000), and the government explained that Summers had repaid about $250,000 after certain victims complained or after Summers learned of the investigation. Sentencing Tr. at 32–34. The Court responded, "Well, I would say that also denotes this case as unusual. We don't – we do sometimes see individuals who, after they're caught, try to … make some payments and so forth. But this is a fairly substantial payment that I do think is to Mr. Summers's credit." <u>Id.</u> at 34. The

Court then sentenced Summers to a term of 21 months in prison, or 12 months below the 33–41 months guidelines range.

What Summers lost by not having the repayments credited against the guidelines loss amount he gained by having them count toward a downward variance under § 3553(a). Had the repayments been credited against the loss amount, Summers's guidelines range would have been 27 to 33 months instead of 33 to 41 months (and his 21-month sentence would still be below the guidelines range). But in that case, the difference between the guidelines range and what the Court thought was an appropriate sentence would have been less, so the downward variance would have been correspondingly less. Put another way, if the repayments had been credited against the loss amount, the Court would not have double-counted the repayments by also factoring them into a downward variance. The Court likely still would have varied somewhat below the guidelines range for other reasons—such as Summers's age, lack of criminal history, and acceptance of responsibility—but Summers fails to show the Court would have varied below the guidelines range as much as it did. In short, Summers received credit for his repayments to the victims, but in the form of a downward variance rather than in the guidelines calculation. He has not shown a reasonable probability that his ultimate sentence would have been lower than 21 months had counsel successfully objected to the lack of credit against the loss amount for guidelines purposes. See Strickland, 466 U.S. at 694.

Because Summers has not shown deficient performance or prejudice under <u>Strickland</u>, relief on this claim will be denied.

## B. The Court's reliance on guidelines commentary

### 1. Argument

Summers also alleges his attorney was ineffective for not objecting to the Court's reliance on § 2B1.1's commentary in calculating the loss amount. Am. § 2255 Motion at 17–23.[6] As Summers puts it, "[a] salient feature in Summers's sentencing should have been credits against loss. The resolution of this issue would turn on U.S.S.G. § 2B1.1, comment. (n. 3(E))." <u>Id.</u> at 20.[7] Summers appears to argue that § 2B1.1, cmt. 3(E)—the application note concerning credits against loss—improperly interprets the meaning of "loss" as used in the guideline, such that the Court should not have considered it. To support the argument, Summers highlights two cases: <u>United States v. Riccardi</u>, 989 F.3d 476 (6th Cir. 2021), and <u>United States v. Dupree</u>, 57 F.4th 1269 (11th Cir. 2023) (en banc).

---

[6]     The Court itself did not explicitly refer to the guidelines commentary at sentencing, but the Probation Officer who prepared the PSR presumably applied the guidelines commentary in calculating the guidelines range.

[7]     In his Notice of Supplemental Authority, Summers broadens his attack on the commentary to § 2B1.1, arguing that the Court should not have relied on the concept of intended loss at all, not just the credit-against-loss commentary, and that counsel should have objected to the same. <u>See</u> Notice of Supp. Authority at 1–2, 6–7. Because Summers has neither sought nor obtained leave to amend his Amended § 2255 Motion, this expanded claim is not properly before the Court. But even considering Summers's expanded challenge to the intended-loss commentary would not alter the Court's conclusion.

In <u>Riccardi</u>, a defendant stole 1,505 gift cards totaling about $47,000 in value. 989 F.3d at 480. Despite that, the district court applied a guidelines loss amount of $752,500 based on an application note to § 2B1.1, which mandates a minimum $500 loss amount for each stolen access device. <u>Id.</u> The Sixth Circuit held that the commentary impermissibly broadened the meaning of the word "loss" because, no matter what definition that word takes on, the commentary's $500 minimum loss amount for each stolen gift card fell outside any zone of ambiguity created by the word "loss." <u>Id.</u> at 483–89. As the court explained:

> No reasonable person would define the "loss" from a stolen gift card as an automatic $500. Rather, the "amount" of the loss or "damage" to the victim from a gift-card theft in any case will turn on such fact-dependent things as the value of the gift card or the costs of replacing it.

<u>Id.</u> at 486 (citation omitted). Thus, the court concluded that the $500-minimum-loss commentary was not a proper "interpretation" of the guideline and should not have been relied on by the district court. <u>Id.</u> at 488–89.

As for <u>Dupree</u>, a decision was still pending in that case when Summers filed the Amended § 2255 Motion. There, the defendant was sentenced as a career offender based on an application note to § 4B1.2 of the United States Sentencing Guidelines, which broadened the meaning of the phrase "controlled substance offense" to include inchoate crimes, like conspiracy to commit a controlled substance offense. The Eleventh Circuit originally affirmed the defendant's sentence based on prior panel precedent, in which the court

concluded "that application note 1 to U.S.S.G. § 4B1.2 'constitutes a binding interpretation of the term 'controlled substance offense.'" <u>United States v. Dupree</u>, 849 F. App'x 911, 912 (11th Cir. 2021) (quoting <u>United States v. Smith</u>, 54 F.3d 690, 693 (11th Cir. 1995)), <u>reh'g en banc granted, opinion vacated,</u> 25 F.4th 1341 (11th Cir. 2022), and <u>on reh'g en banc,</u> 57 F.4th 1269 (11th Cir. 2023). The Eleventh Circuit then agreed to rehear <u>Dupree</u> <u>en</u> <u>banc</u>. Summers argued in his Amended § 2255 Motion that "[t]he grant of rehearing <u>en</u> <u>banc</u> suggests that [the Eleventh Circuit] will likely follow the lead" of other circuits "and revisit its body of law interpreting this and similar guideline commentary in light of" <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400 (2019). Am. § 2255 Motion at 19. "Were that to occur," Summers asserted, "then the sentenc[e] in Summers's case would be subject to reversal, because Summers was sentenced based on a guideline loss amount which was unreasonably determined under guideline commentary [that] would no longer be governing." <u>Id.</u> at 19–20. Summers argued that the grant of rehearing <u>en</u> <u>banc</u> in <u>Dupree</u> "augurs a sea change in guideline determinations" and that "[r]easonably competent counsel would have been aware that <u>DuPree</u> [sic] was pending <u>en</u> <u>banc</u> determination, and preserved the issue at sentencing." <u>Id.</u> at 23. The government responded that Summers's former counsel could not have been ineffective for not anticipating a change in the law as it relates to the authoritativeness of the guidelines commentary. Response at 12–13.

The Eleventh Circuit issued its en banc decision in Dupree on January 18, 2023. The court held that § 4B1.2's definition of a "controlled substance offense" excludes inchoate crimes and that the application note counting inchoate crimes as "controlled substance offense[s]" deserves no deference. Dupree, 57 F.4th at 1271. The court observed that the sentencing guidelines' commentary is analogous to an agency's interpretation of an agency rule. Id. at 1274 (citing Stinson v. United States, 508 U.S. 36, 45 (1993)). Under Kisor v. Wilkie, the court explained, a court should defer to the Sentencing Commission's interpretation of a guideline only if, after exhausting all the traditional tools of textual construction, the guideline is genuinely ambiguous. See Dupree, 57 F.4th at 1274–76. The Eleventh Circuit concluded that the text of § 4B1.2(b) "unambiguously excludes inchoate crimes," and therefore courts cannot rely on the application note counting inchoate crimes as serious drug offenses. Id. at 1279.

In his Notice of Supplemental Authority, Summers argues that "under Dupree the guideline definition of loss means what it says, loss, and it was error to apply the commentary which enhanced the guideline level based on intended loss." Notice of Supp. Authority at 6. According to Summers, "[r]easonably competent defense counsel would have made this argument at sentencing, objected to the intended loss amount on this basis, and had he done so Summers['s] sentenc[e] would have been reversed on appeal." Id. at 6–7.

### *2. Analysis*

"[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson, 508 U.S. at 38. In Stinson, the Supreme Court analogized commentary in the Sentencing Guidelines to a federal agency's interpretation of one of its regulations, which is "given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation'" or in violation of the Constitution or a federal statute. Id. at 45 (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)). This type of deference—respecting a federal agency's interpretation of its own rules (rather than an agency's interpretation of a statute passed by Congress)—is called "Auer deference"[8] or "Seminole Rock deference." Kisor, 139 S. Ct. at 2408.

In 2019, the Supreme Court circumscribed Auer deference in Kisor v. Wilkie. There, the Court explained that Auer deference applies only if (1) the regulation being interpreted is "genuinely ambiguous" after "exhaust[ing] all the 'traditional tools' of construction," id. at 2415; (2) the agency's reading is "reasonable," meaning the interpretation "come[s] within the zone of ambiguity the court has identified after employing all its interpretive rules," id. at 2415–

---

[8]        Auer v. Robbins, 519 U.S. 452 (1997).

16; and (3) "the character and context of the agency interpretation entitles it to controlling weight," id. at 2416. This last consideration requires a court to look for "important markers for identifying when Auer deference is and is not appropriate." Id. Those "important markers" include these: (1) the regulatory interpretation must be the agency's "authoritative" or "official position," rather than an ad hoc statement, meaning the interpretation "at least emanate[s] from those actors, using those vehicles, understood to make authoritative policy in the relevant context," id. at 2416; (2) "the agency's interpretation must in some way implicate its substantive expertise," id. at 2417; and (3) the "agency's reading of a rule must reflect 'fair and considered judgment,'" id. So understood, Auer deference is "cabined … in various and critical ways," but "[w]hen it applies, Auer deference gives an agency significant leeway to say what its own rules mean." Id. at 2418.

Kisor's clarification of Auer deference extends to the application of the Sentencing Guidelines and its commentary. Dupree, 57 F.4th at 1274–76. But what Kisor and Dupree mean for the commentary to U.S.S.G. § 2B1.1, including the credit-against-loss commentary, has not been resolved in this circuit. As Summers observes, the Sixth Circuit applied Kisor to conclude that an application note to § 2B1.1, which mandated a minimum $500 loss amount for each stolen access device regardless of the actual value, impermissibly broadened the meaning of "loss." Riccardi, 989 F.3d at 479–80. And in Dupree,

the <u>en</u> <u>banc</u> Eleventh Circuit held that an application note to § 4B1.2 could not expand the unambiguous definition of a "controlled substance offense" by adding generic conspiracies to that definition. But <u>Riccardi</u> is not binding in this circuit, <u>Dupree</u> had not been decided when Summers's former counsel represented him at sentencing, and neither case addresses the credit-against-loss application note (or the use of intended loss more generally) under § 2B1.1's commentary.

Nor has <u>Stinson</u> been overruled or abrogated to the point it is no longer binding. As recently as June 2021—two years after <u>Kisor</u> and only a few months before Summers was sentenced—the Eleventh Circuit said in a published decision that "[o]f course, commentary in the guidelines is authoritative." <u>United States v. Henry</u>, 1 F.4th 1315, 1325 (11th Cir. 2021) (citing <u>Stinson</u>, 508 U.S. at 38). In <u>United States v. Cingari</u>, decided the year after <u>Kisor</u>, the Eleventh Circuit applied <u>Stinson</u> to conclude that a different application note to § 2B1.1 was authoritative, 952 F.3d 1301, 1308–11 (11th Cir. 2020), even though the "commentary sometimes requires interpreting a guideline in a way that 'may not be compelled by the guideline text,'" <u>id.</u> at 1308 (quoting <u>Stinson</u>, 508 U.S. at 47). And in an unpublished decision, the Eleventh Circuit said <u>Kisor</u> "did not purport to overrule <u>Stinson</u>, nor did it directly address the interpretation of the guidelines or its commentary. So <u>Kisor</u> does not establish plain error in this case, even if it may ultimately call for a less deferential

approach to guidelines commentary." <u>United States v. Dugger</u>, No. 21–14010, 2022 WL 2800204, at *4 (11th Cir. July 18, 2022).

Summers argues that <u>Stinson</u> and <u>Kisor</u> gave his counsel the tools "to attack the use of the guideline commentary in calculating Summers' credits against loss." Reply at 3. Thus, he contends "[r]easonably competent counsel would have objected to the use of commentary, which is an addition to the text, not a clarification of an ambiguous guideline." <u>Id.</u> He also argues that "[r]easonably competent counsel would have been aware that <u>DuPree</u> [sic] was pending <u>en</u> <u>banc</u> determination, and preserved the issue at sentencing." Am. § 2255 Motion at 23.

Summers is wrong to suggest that counsel should "have been aware that [<u>Dupree</u>] was pending <u>en</u> <u>banc</u> determination, and preserved the issue at sentencing." <u>Id.</u> Summers was sentenced on November 1, 2021, but the Eleventh Circuit did not decide to rehear <u>Dupree</u> <u>en</u> <u>banc</u> until February 18, 2022. <u>See</u> <u>Dupree</u>, No. 19–13776, Order of Feb. 18, 2022, Granting Rehearing <u>En</u> <u>Banc</u>. Although an Eleventh Circuit judge entered an order on August 19, 2021, withholding issuance of the mandate in <u>Dupree</u>, the Eleventh Circuit did not actually vacate the panel opinion and agree to rehear the case until three months after Summers was sentenced. Thus, at the time of sentencing, Summers's counsel only could have speculated about whether the Eleventh Circuit would rehear <u>Dupree</u> <u>en</u> <u>banc</u>, let alone know how the court would rule.

Besides, even if <u>Stinson</u> and <u>Kisor</u> gave Summers's counsel the "tools" to challenge the authoritativeness of § 2B1.1's commentary, it was not such an obviously meritorious argument that "no competent counsel" would have failed to raise it. <u>Chandler v. United States</u>, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc) (citation and footnote omitted). Summers fails to explain why the credit-against-loss application note does not deserve <u>Auer</u> deference under <u>Kisor</u> and <u>Stinson</u>. He does not describe how the credit-against-loss application note (or the use of intended loss more generally) "violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of" § 2B1.1 after exhausting all the traditional tools of interpretation. <u>Stinson</u>, 508 U.S. at 38; see <u>Kisor</u>, 139 S. Ct. at 2415–17. And he points to no on-point, controlling law from the Supreme Court or the Eleventh Circuit holding that the credit-against-loss application note or the use of intended loss is an unreasonable interpretation of § 2B1.1. When Summers was sentenced, the Eleventh Circuit still considered guidelines commentary to be "authoritative." <u>Henry</u>, 1 F.4th at 1325; see also <u>Cingari</u>, 952 F.3d at 1308–11. And since then, it has rejected the argument that <u>Kisor</u> overruled <u>Stinson</u>. See <u>Dupree</u>, 57 F.4th at 1274–76; <u>Dugger</u>, No. 21–14010, 2022 WL 2800204, at *4. Thus, when Summers was sentenced, an argument that the relevant commentary to § 2B1.1 was not controlling would have been unsupported by existing precedent or, at best, based on unsettled law. And the success of such an objection would have

depended on legal developments that had not yet occurred, such as the en banc decision in Dupree.

The Eleventh Circuit has "held many times that '[r]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop.'" Spaziano v. Singletary, 36 F.3d 1028, 1029 (11th Cir. 1994) (citation omitted). Summers himself admits that Dupree represents a "sea change" in the law. Am. § 2255 Motion at 23. But the Eleventh Circuit has "a wall of binding precedent that shuts out any contention that an attorney's failure to anticipate a change in the law constitutes ineffective assistance of counsel." United States v. Ardley, 273 F.3d 991, 993 (11th Cir. 2001) (Carnes, E., J., concurring in denial of rehearing en banc) (collecting cases). "That rule applies even if the claim based upon anticipated changes in the law was reasonably available at the time counsel failed to raise it." Id. (citing Pitts v. Cook, 923 F.2d 1568, 1572–74 (11th Cir. 1991)). As a result, Summers's allegations fail to show that his former counsel performed deficiently under Strickland by not objecting to the Court's reliance on the commentary to § 2B1.1 in calculating the guidelines loss amount.

Nor has Summers shown that he was prejudiced. As explained in Part III.A.2, because the Court varied downward to credit Summers for the $250,000 he repaid some of the victims, he has not shown a reasonable probability that his sentence would have been lower had the guidelines loss amount been

$486,000 (the actual net loss to the victims) instead of $739,910. Thus, Summers is not entitled to relief on this claim.

## IV.   Certificate of Appealability

The undersigned finds that a certificate of appealability is not warranted. This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Summers "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335–36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

When a district court has rejected a petitioner's claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct

in its procedural ruling." <u>Id.</u> Upon consideration of the record as a whole, this Court will deny a certificate of appealability.

### V.    Conclusion

Having considered each of Summers's claims, and finding that none warrants relief under 28 U.S.C. § 2255, it is **ORDERED:**

1.  Petitioner Daniel Steven Summers's Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Civ. Doc. 3) is **DENIED.**

2.  The Clerk will enter judgment for the United States and against Summers, and close the file.

3.  If Summers appeals this Order, the Court denies a certificate of appealability (COA). Because this Court has determined that a COA is not warranted, the Clerk will terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed. Such termination will serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida this 24th day of March, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

lc 19
Copies:
Parties and counsel of record